UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

| | |
|---|---|
| JOHN E. SPENLINHAUER, ET AL., ) <br> ) <br> PLAINTIFFS ) <br> ) <br> v. ) <br> ) <br> R.R. DONNELLEY & SONS ) <br> COMPANY, ET AL., ) <br> ) <br> DEFENDANTS ) | CIVIL NO. 08-13-P-H |

DECISION AND ORDER ON DEFENDANT R.R. DONNELLY & SONS COMPANY'S MOTION FOR SUMMARY JUDGMENT AND PLAINTIFFS' CROSS-MOTION FOR SUMMARY JUDGMENT

This dispute involves interpretation of a corporate stock purchase agreement. Primarily, the parties disagree over which provision of the agreement governs a settlement between OSHA and the sellers that occurred without the buyers' consent after the agreement was signed but before the transaction closed. I conclude that the contract provision dealing specifically with settlements governs. I **GRANT IN PART** the Plaintiffs' Motion for summary judgment and **DENY** the defendants' motion for summary judgment.

## I. FACTS AND PROCEDURAL HISTORY

The following facts are undisputed. On October 5, 2005, R.R. Donnelley & Sons Company and R.R. Donnelley Maine, Inc. (collectively "buyers") agreed to pay about $60,000,000 to purchase Spencer Press of Maine, Inc. ("SPI") from John E. Spenlinhauer, Stephen P. Spenlinhauer, JRS Realty Trust, and J & S

Trust of Maine (collectively "sellers"). They did so by executing a stock purchase agreement ("SPA" or "Agreement"). SPA, Ex. A to Decl. of Audra D. Cohen ("Cohen Decl.") (Docket No. 30-4). The Agreement included several disclosure schedules, including one entitled "Litigation." SPA Schedules 3.17(a), Ex. B to Cohen Decl. (Docket No. 30-12). On the Litigation Schedule, the sellers disclosed an active workers' compensation claim for employee James Moulton resulting from a chest contusion; they listed the insurance reserve amount as $350. Id. In addition, the sellers disclosed the existence of an Occupational Safety and Health Administration ("OSHA") proceeding arising out of Moulton's injury:

> OSHA issued a Notice of Alleged Safety or Health Hazards on August 15, 2005. The notice was issued after an anonymous complaint was filed relating to an injury received by James Moulton when his shirt became entangled with an unguarded printing press. The employee was able to continue working the day of the incident. A guard was fabricated and installed by SPI shortly after the incident. Based on the nature of the injury, SPI believes that a fine imposed by OSHA would be nominal.

SPA Schedules at 31. The Agreement provided that the sellers were to continue to operate the business in the ordinary course until the closing.

On October 13, 2005, OSHA issued a "Citation and Notification of Penalty" to SPI, charging that the Moulton accident resulted from a "willful" violation of OSHA regulations and assessed a penalty of $63,000.00. OSHA Citation and Notification of Penalty, Ex. A to Decl. of Martin B. Jackson at 2 ("Jackson Decl.") (Docket No. 31-2). The sellers received the OSHA citation on October 17, 2005. R.R. Donnelley's Environmental, Health and Safety

2

Assessment Team Summary Report, Ex. A to Decl. of U. Charles Remmel ("Remmel Decl.") (Docket No. 37). The OSHA citation also notified SPI that an informal conference would be held on October 24, 2005. OSHA Citation and Notification of Penalty at 3. The buyers became aware of the OSHA Citation upon receiving an Environmental, Health, Safety ("EHS") Assessment dated October 20, 2005. It summarized "Open EHS Issues" as:

> OSHA Citation Issued for Machine Guarding on October 13. Received Oct. 17. Willful Violation for $63,000. Guarding installed at time of inspection (8-18-05). Spencer plans to attend an informal conference on October 24. No further abatement required. No financial cost to correct expected. Payment will likely occur after 11-1-05.

R.R. Donnelley's Environmental, Health and Safety Assessment Team Summary Report.

On October 24, 2005, the sellers agreed to an Informal Settlement Agreement ("Settlement Agreement") with OSHA. OSHA Informal Settlement Agreement, Ex. B to Jackson Decl. (Docket No. 31-3). They did not seek the buyers' consent to the Settlement Agreement. The OSHA Settlement Agreement required that SPI (i) pay a thirty-five thousand dollar ($35,000.00) penalty, (ii) "appoint and train an asst. safety director within [the] next 30 days," (iii) perform "an annual safety audit to be conducted by corporate and forwarded to the OSHA office for the next 3 years" and (iv) waive SPI's "rights to contest the [OSHA] citation(s) and penalties." Id. at 1-4.

On November 2, 2005, the sellers provided the buyers a draft updated "Schedule 3.17(b)-Orders, Judgments, Etc." Supplemental Decl. of Audra D. Cohen (Docket No. 47) ¶ 3; E-mail of November 2, 2005 from Philip Taub to

3

Audra D. Cohen, Ex. B to Remmel Decl. The draft Amended Schedule 3.17(b) provided, in relevant part:

> OSHA completed its investigation of the incident surrounding the injuries sustained by James Moulton when his shirt became entangled with an unguarded printing press. Although SPI initially believed his injuries to be minor, Mr. Moulton subsequently consulted a second doctor and has allegedly suffered a cracked sternum. As a result of the allegations of an injury, OSHA imposed $35,000 fine on SPI, which SPI has paid. The order provided that SPI must assign a person to act as Mark Dionne's assistant and train such person on safety matters. SPI must also perform safety audits for the next three (3) years and submit such audits to OSHA for review.

E-mail of November 2, 2005 from Philip Taub to Audra D. Cohen. The sellers finalized this draft provision without change and included it in the closing documents on November 9, 2005. SPA Amended Schedules, Ex. C to Cohen Decl. (Docket No. 30-14) at 4.

On November 9, 2005, the stock purchase transaction closed notwithstanding the parties' knowledge of the OSHA Settlement Agreement. Pls.' Compl. ¶ 10. At that time, John E. Spenlinhauer and Stephen P. Spenlinhauer entered into an escrow agreement with the buyers, placing $5 million of the $60 million purchase price into an escrow account. Escrow Agreement, Ex. D to Cohen Decl. at 3-4 (Docket No. 30-15). The stated purpose of the Escrow Agreement was to provide a source of funds to satisfy the sellers' potential indemnification obligations for any breaches of representations, warranties, covenants and agreements under the SPA. Id. at 1. According to Section 3.2(f) of the Escrow Agreement, if the buyers delivered notice to the escrow agent by November 9, 2007, that there had been over

4

$100,000 of losses in respect of certain claims, then the escrow agent was required to withhold payment to the sellers from the escrow account until the claim was resolved. Id. at 10.

On November 8, 2007, the buyers notified the escrow agent:

> There is a pending but unresolved Claim, which Claim was made by Buyers on March 28, 2006 (the "OSHA Claim"), relating to among other things, various violations of OSHA by SPI and its Subsidiaries prior to the Closing in violation of the Stock Purchase Agreement. In connection with the OSHA Claim Buyers have incurred documented Losses as of November 6, 2007 in the amount of $1,070,213.89 (of which the Buyers have not yet received payment for $1,059,013.89 from the Indemnification Escrow Account) and the Buyers expect to suffer additional Losses and claim indemnification for such Losses pursuant to Article VIII of the Stock Purchase Agreement and the Escrow Agreement.

First Reduction Notice, Ex. 2 to Pls.' Compl. (Docket No. 1-3). After failing to resolve the claim, the sellers filed this lawsuit in the Maine Superior Court. They requested a declaration requiring the escrow agent to release the money to them. The buyers removed the case to this court and counterclaimed, alleging that the sellers breached various provisions of the stock purchase agreement and claiming approximately $1.6 million of the escrow account. The parties have now filed cross motions for summary judgment on various liability and damage issues.

## II. DISCUSSION

### A. *Contract Claims for Alleged Breach of Covenants in Article V*

The buyers ask me to find the sellers breached Article V of the Stock Purchase Agreement by entering into the OSHA Settlement Agreement without obtaining the buyers' prior written consent. Specifically, they assert that the

sellers violated five provisions of SPA section 5.1. The sellers also move for summary judgment on the same provisions of section 5.1, and request that I declare that their actions did not violate those provisions of the SPA.

During the interval before closing, the provisions at issue require the sellers to obtain the buyers' prior written consent to:

> (h) make any payment to or on behalf of, or enter into, terminate, amend or waive any rights under any Business Contract . . .;[1]
>
> . . . .
>
> (q) enter into any Material Contract or agreement, arrangement, contract, commitments or transaction which would constitute a Material Contract if it was in effect on the date of this Agreement;[2]
>
> (r) settle or compromise any claim, suit, action, arbitration, dispute or other proceeding (i) that could reasonably be expected to adversely impact or effect . . . SPI or any of its Subsidiaries, the Business or any of the Transferred Assets or (ii) involving more than $50,000;
>
> . . . .
>
> (y) do any other act which would cause any representation or warranty of the Sellers in this Agreement to be or become untrue in any material respect or intentionally omit to take any action necessary to prevent any such representation or warranty from being untrue in any material respect at such time; or
>
> (z) agree, whether in writing or orally, whether formally or informally, or commit to engage in any of the foregoing.

---

[1] "Business Contracts" are defined as "all Contracts (other than this Agreement, the Ancillary Agreements, the Employment Agreements and the Consulting Agreement) that are Related to the Business or to which any of the Transferred Assets are subject, except to the extent included in the Excluded Assets."  SPA § 1.1.

[2] "Material Contract" is defined as a contract "that is of any nature not otherwise described in this Section 3.16 (without reference to dollar amounts) which is material to the Business, its properties or its assets, taken as a whole (the Business Contracts included in Section 3.16 through Section 3.16(q) being collectively referred to herein as the "Material Contracts")."  SPA §§ 1.1, 3.16(q).

SPA § 5.1. I address each of them.

### (1) Section 5.1(r)

The buyers argue that execution of the OSHA Settlement Agreement breached the sellers' covenant under subsection (r) because the settlement "could reasonably be expected to adversely impact or effect [sic] . . . SPI or any of its Subsidiaries, the Business or any of the Transferred Assets" or "involve[ed] more than $50,000." SPI § 5.1(r). The sellers disagree. The OSHA Settlement Agreement required SPI to pay a $35,000 fine, to appoint and train an assistant safety director and to conduct annual safety audits for three years and to forward those annual audits to the OSHA office.[3] On this record, there is insufficient evidence to determine whether the total cost of the Settlement Agreement (the cost of the affirmative acts plus the fine) exceeded $50,000 or otherwise "could reasonably be expected to adversely impact or effect [sic]" SPI. The parties have not even argued what "could reasonably be expected to adversely impact or effect [sic]" means as distinguished from the clear demarcation of $50,000.

---

[3] The parties also dispute whether the provision in the OSHA Settlement Agreement requiring SPI "to continue to comply with all applicable provisions of the Occupational Safety and Health Act of 1970, and the applicable safety and health standards promulgated pursuant to the Act" costs the buyers more money each year in order to be OSHA-compliant or whether that is already a legal obligation. OSHA Informal Settlement Agreement, Ex. B to Jackson Decl. at 3. To the extent the defendants assert that the cost of SPI's continued OSHA compliance results from this provision of the Settlement Agreement, I disagree. As the plaintiffs point out, SPI's compliance with OSHA regulations is perpetually required pursuant to federal law, which provides that "[e]ach employer . . . shall comply with the occupational safety and health standards" promulgated by OSHA. 29 U.S.C. § 654(a)(2). I conclude that the provision in the OSHA Settlement Agreement that requires continued compliance with federal law is not financially attributable to the sellers.

7

*(2) Section 5.1(h)*

Under subsection (h), the buyers argue that the OSHA Settlement Agreement is a "Business Contract"—in other words, completely prohibited regardless of its scope. Although a settlement agreement can be considered a contract and could potentially qualify as a "Business Contract," subsection (r) is directed specifically at the issue of settling claims. If I were to accept the buyers' interpretation of subsection (h), then it would conflict with subsection (r). I will not read the provisions of the Agreement in a way that creates a conflict. Section 5.1(r) is clear: the sellers are permitted to settle claims for less than $50,000 without the written consent of the buyers unless they otherwise have "could reasonably be expected to adversely impact or effect [sic] . . . SPI or any of its Subsidiaries, the Business or any of the Transferred Assets." SPI § 5.1(r). I must give content to that language.

This interpretation is consistent with the longstanding rule of construction that "[w]here general and specific clauses conflict, the specific clause governs the meaning of the contract." 11 Richard A. Lord, Williston On Contracts § 32.10 (4th ed. 1999) (citing Restatement (Second) of Contracts § 203(c)); 5 Corbin on Contracts § 24.23 (1998) ("[W]ords of general description should generally yield to words that are more specific."); Aramony v. United Way of Am., 254 F.3d 403, 413 (2d Cir. 2001) (It "is a fundamental rule of contract construction that specific terms and exact terms are given greater weight than general language.") (quoting Restatement (Second) of Contracts § 203(c) (1981)); John Hancock Mut. Life Ins. Co. v. Carolina Power & Light

8

Co., 717 F.2d 664, 669 n.8 (2d Cir. 1983) (noting that "New York law recognizes that definitive, particularized contract language takes precedence over expressions of intent that are general, summary, or preliminary"); see also Kayfield Constr. Corp. v. United States, 278 F.2d 217, 219 (2d Cir. 1960) (interpreting a contract by its more specific terms rather than by "the general language of . . . other paragraphs").[4]  The "Business Contract" provision in section 5.1(h) of this Agreement is general: it prevents the sellers from entering essentially all contracts on behalf of SPI without receiving the buyers' prior written approval.  In contrast, section 5.1(r) allows the settlement of certain claims without prior written approval. The buyers' interpretation of subsection (h) renders subsection (r) meaningless.  Accordingly, I conclude that the OSHA Settlement Agreement is not subject to the "Business Contract" limitation.

### (3) Section 5.1(q), (y) and (z)

My reasoning with respect to subsection (h) is equally applicable to subsections (q), (y) and (z).  That is, the general obligation of the sellers not to enter into any "Material Contracts," commit an act "which would cause any

---

[4] The SPA states that it is controlled by New York law, SPA § 9.5, and I have cited cases applying New York law.  The parties cite only Maine law in their briefs.  To the extent that the Maine Law Court has addressed the issue, it does not seem to differ materially. The Maine Law Court traditionally has favored the general principles of construction enunciated in the Restatement (Second) Contracts.  See, e.g., Guilford Transp. Indus. v. Pub. Utils. Comm'n, 746 A.2d 910, 914 (Me. 2000) (quoting Restatement (Second) of Contracts § 202(3)(A) (1981)); Tondreau v. Sherwin-Williams Co., 638 A.2d 728, 731 (Me. 1994) (Clifford, J., concurring) (citing Restatement (Second) of Contracts § 202(4) (1981)).  Moreover, the Law Court has adopted the maxim that specific language controls over general language in the context of statutory text, see Ziegler v. Am. Maize-Prods. Co., 658 A.2d 219, 222 (Me. 1995), and the text of state civil procedure rules, see Tisei v. Town of Ogunquit, 491 A.2d 564, 568 n.2 (Me. 1985). Furthermore, the Maine Superior Court has expressly relied upon provisions of Section 203. See Moody v. Me. State Lottery, 2003 WL 21958204, at *2 (Me. Super. Ct., June 12, 2003) (quoting Restatement (Second) of Contracts § 203(a) (1981)).  Accordingly, I believe that the Law Court would adopt Section 203(c) of the Restatement as representative of Maine common law on contract interpretation.

9

representation or warranty" to become untrue, or enter into an agreement that violates the provisions of Article V, without the prior written approval of the buyers, cannot be read to override the specific provision of subsection (r) permitting the sellers to settle certain claims without asking for the buyers' approval. An interpretation that gives a reasonable and effective meaning to all the terms is preferred to the buyers' interpretation, which leaves subsection (r) with no effect.

Thus, I **GRANT IN PART** the sellers' request for summary judgment and I **DECLARE** that by entering into the OSHA settlement agreement the sellers did not breach section 5.1(h), (q), (y) or (z). Since I find that there are issues of fact as to whether subsection (r) is applicable, I **DENY** the sellers' motion for summary judgment on section 5.1(r). I **DENY** the buyers' motion for summary judgment on Article V of the SPA.

### B. *Contract Claims for Alleged Breach of the Representations and Warranties in Article III*

The buyers also assert that the OSHA Settlement Agreement caused the sellers' representations and warranties to become untrue. Specifically, they argue that because the Settlement Agreement was not listed on Schedules 3.16, 3.17(a) or 3.17(b) on October 5 when the Stock Purchase Agreement was signed, the later execution of the OSHA Settlement Agreement caused the earlier and continuing representations and warranties under those sections to become untrue. In addition, the buyers claim that the Settlement Agreement—admitting that SPI had willfully violated OSHA—also caused the

10

representation and warranty in section 3.18 to be untrue. The sellers maintain that they acted in conformity with the contractual provisions in the SPA.

The SPA provides, in pertinent part, as follows:

> Section 3.16 <u>Contracts</u>: Set forth on Schedule 3.16 is a complete and accurate list of each of the Business Contracts.
>
> Section 3.17 <u>Litigation</u>: (a) Except as set forth on Schedule 3.17(a), there are no civil, criminal or administrative actions, causes of action, claims, suits, demands, proceedings, hearings, investigations, orders, writs, injunctions or decrees pending or, to the Sellers' knowledge, threatened against or relating to (i) SPI or any of its Subsidiaries or affecting their respective properties or assets . . . (b) Except as set forth on Schedule 3.17(b), none of SPI or any of its Subsidiaries, any of their respective properties or assets, the Business or any of the Transferred Assets is subject to any order, writ, judgment, award, injunction or decree of any Governmental Entity or other regulatory authority of competent jurisdiction or any arbitrator or arbitrators.
>
> Section 3.18 <u>Compliance with Law</u>: (a)(i) Each of SPI and its Subsidiaries and the Business, have been, and are in compliance with all applicable Laws, [and] (ii) none of the Sellers or any of their respective Affiliates has received any notice alleging any violation under any applicable Law . . .; it being understood that nothing in this representation is intended to address any compliance issue that is specifically addressed by any other representation or warranty set forth herein.

### *(1) Section 3.16*

I have already determined that the OSHA Settlement Agreement does not fall within the SPA's provisions for "Business Contracts." Therefore, there can be no breach of contract claim based on the sellers' failure to disclose the OSHA Settlement Agreement in schedule 3.16.

### *(2) Section 3.17*

The buyers appear to allege a breach of contract claim based on the sellers' failure to disclose the OSHA complaint on the Stock Purchase Agreement's "Litigation" schedule 3.17(a) or disclose the Settlement Agreement on the "Orders, Judgments, Etc." schedule 3.17(b). When the SPA was signed on October 5, 2005, the sellers disclosed in schedule 3.17(a) the basic information that an anonymous OSHA complaint had been filed with respect to the Moulton injury.  OSHA first issued its proposed penalty in a "Citation and Notification of Penalty" on October 13, 2005, which was received by SPI on October 17, 2005.  Although there is no affirmative evidence in the summary judgment record that the sellers notified the buyers that they received the OSHA citation, the buyers' EHS Assessment Team summary report of October 20, 2005, shows that they knew of it. It refers to the OSHA citation charging a "willful violation for $63,000," and states that an informal hearing with OSHA is scheduled for October 24, 2005.  It is also undisputed that, after the OSHA violation was resolved, the sellers notified the buyers of the settlement terms before the closing and provided a supplemental Amended Schedule 3.17(b).  On this record, there can be no viable claim that the sellers failed to disclose the OSHA complaint in the first instance in schedule 3.17(a) or that they failed to disclose the terms of the OSHA Settlement Agreement in the Amended Schedule 3.17(b) prior to closing.

*(3) Section 3.18*

The defendants contend that the OSHA violation that existed at the time of closing caused the sellers to breach the representations and warranties in section 3.18. There is no evidence in this factual record that SPI breached section 3.18 when the parties signed the SPA on October 5, 2005 or at closing on November 9, 2005. With respect to the OSHA violation, section 3.18 of the SPA provides, in part:

> (a)(i) Each of SPI and its Subsidiaries and the Business, have been, and are in compliance with all applicable Laws, [and] (ii) none of the Sellers or any of their respective Affiliates has received any notice alleging any violation under any applicable Law . . .; it being understood that nothing in this representation is intended to address any compliance issue that is specifically addressed by any other representation or warranty set forth herein.

In this case, the last phrase of section 3.18 defeats the representations and warranties made in the prior provisions—(a)(i) and (a)(ii)—because the sellers specifically disclosed in SPA schedule 3.17(a) Moulton's active workers' compensation claim and the OSHA Notice of Alleged Safety or Health Hazard. SPA Schedule 3.17(a). Later, the sellers amended Schedule 3.17(b) to disclose the OSHA Settlement Agreement. Therefore, the representations and warranties made in SPA Schedule 3.17(a) and Amended Schedule 3.17(b) regarding the OSHA violation and Settlement Agreement specifically disqualify the OSHA violation from the representations and warranties made in section 3.18. Accordingly, no violation of section 3.18 occurred.

Therefore, I **GRANT IN PART** the sellers' request for summary judgment and **DECLARE** that no violation of sections 3.16 3.17 and 3.18 occurred and I **DENY**

13

the buyers' request for summary judgment based on a breach of sections 3.16, 3.17 and 3.18 of the SPA.

### *C. The Plaintiffs' Request for Declaratory Relief Pursuant to Section 5.1(a)(i)*

The sellers argue that section 5.1(a)(i) modified section 5.1(r) to permit them to incur $300,000 worth of indebtedness, and that the liabilities associated with the OSHA Settlement Agreement became Assumed Liabilities. Thus, the sellers assert, they did not breach Article V by entering into the OSHA Settlement Agreement because any of the costs associated with the Settlement Agreement are permitted under section 5.1(a)(i). The buyers disagree about the meaning of section 5.1(a)(i).

Under section 5.1 of the SPA, the sellers covenanted that during the interval before closing, "without the prior written consent of [the buyers]," they would not, nor would they cause SPI or its subsidiaries to "(a)(i) create, incur, assume or modify any Indebtedness, except that the sellers may create, incur, assume or modify $300,000 of Indebtedness that is not Assumed Indebtedness[.]" The buyers assert that Section 5.1(a)(i) simply provides that the incurrence of $300,000 of Indebtedness, if it is not to be passed onto or assumed by the buyers, does not breach the first covenant set forth in section 5.1(a)(i). They argue that section 5.1(a) does not permit the sellers to incur Indebtedness that would later be borne by the buyers—it only allows the sellers to incur Indebtedness that was not Assumed Indebtedness and that they, the sellers, therefore, would bear.

14

I agree with the buyers' interpretation of section 5.1(a)(i). Section 5.1(a)(i) does not create rights for the sellers to incur indebtedness that the buyers will have to assume. It merely defines the circumstances under which the incurrence of certain sellers' indebtedness will not constitute a breach of the first covenant "(a)" under section 5.1 of the SPA. Under section 3.8 (which defines "Assumed Indebtedness"), all Assumed Indebtedness must be "[s]et forth on Schedule 3.8(c) [which] is a complete and accurate list, including the applicable interest rates, of the only Indebtedness of SPI and its Subsidiaries that will not be the subject of Debt Agreements (the 'Assumed Indebtedness')." SPA at 28. Schedule 3.8(c) did not contain any reference to the OSHA Settlement Agreement or any indebtedness incurred as a result of the OSHA Settlement Agreement. SPA Schedules at 27. Moreover, schedule 3.8(c) was never amended or updated by the sellers to include the OSHA Settlement Agreement or any indebtedness incurred as a result of the OSHA Settlement Agreement. SPA Amended Schedules. Thus, the OSHA Settlement Agreement was not an Assumed Indebtedness.

Therefore, I **DENY** the sellers' motion for summary judgment grounded in section 5.1(a)(i) of the SPA.

### D. *Waiver*

The sellers argue that the buyers waived their breach of contract claims by closing on the transaction and that they should now be estopped from asserting a breach. The buyers' conduct in maintaining silence throughout multiple steps, the sellers assert, is inequitable. The buyers disagree, asserting

15

that their representatives informed the sellers' representatives that the OSHA Settlement Agreement constituted breach of the SPA. The evidentiary record is in dispute on the issue whether the buyers communicated to the sellers, prior to closing, that the OSHA Settlement Agreement constituted a breach of the SPA.

The buyers also assert that the sellers' waiver argument fails because the SPA explicitly requires the waiver to be in writing. The SPA addresses waiver explicitly in section 9.2:

> Any provision of this Agreement may be waived by the party or parties entitled to the benefits thereof only by a written instrument signed by the party granting such waiver, but such waiver or failure to insist upon strict compliance with such obligation, covenant, agreement or condition shall not operate as a waiver of, or estoppel with respect to, any subsequent or other failure.

SPA at 75. There is no evidence in the record that the buyers ever provided a written waiver consent with respect to the OSHA Settlement Agreement. Thus, I **DENY** the sellers' motion for summary judgment on the basis of waiver.

### *E. Liability of J & S*

The sellers assert that J & S Trust of Maine ("J & S") is subject only to limited liability for certain breaches of the representations and warranties in the SPA. They say that J & S is entitled to summary judgment because none of those particular representations and warranties clauses are at issue. Section 8.2(a)—"Indemnification by Sellers"—provides that the sellers will indemnify the buyers for breaches of representations, warranties and covenants. The liability of J & S is restricted under this section 8.2(a), the sellers contend, to

"indemnify, defend and hold harmless . . . the Buyers" with respect to breaches or inaccuracies in representations and warranties in sections 3.11 ("Real Property"), 3.21 ("Tax matters"), 3.22 ("Environmental"), 5.17 ("Tax matters") and 5.24 ("RJS Claims").  SPA at 70-71.  In response, the buyers assert that under section 8.2(a), J & S Trust also remains liable to the buyers with respect to "any Losses imposed on, sustained, incurred or suffered by . . . any of the Buyers Indemnified Parties . . . directly or indirectly relating to, arising out of or resulting from . . . (z) any of the Excluded Liabilities."  Id. at 70.  The buyers assert that the indemnification claim arising as a result of the OSHA settlement is one of the "Excluded Liabilities" for which J & S Trust remains liable to them.

"Excluded Liabilities" include all indebtedness of the sellers that is not included in "Assumed Liabilities."  Id. at 7.  "Assumed Liabilities" include liabilities of the sellers under "Business Contracts other than [Business Contracts] arising out of or relating to (i) any breach that occurred prior to the Closing."  Id. at 2-3.  The relevant language found in the definition of "Assumed Liabilities," therefore, pertains only to Business Contracts.  As noted above, the OSHA Settlement Agreement is not a "Business Contract" for purposes of the SPA.  Accordingly, the OSHA Settlement Agreement does not fall within the definition of "Assumed Liabilities."  Because the sellers fail to point to any other language in the definition of Assumed Liabilities, I agree with the buyers that the OSHA Settlement Agreement is not an assumed liability, and thus the OSHA Settlement Agreement is considered an Excluded Liability.  Pursuant to

17

section 8.2(a), J & S is liable for losses imposed on the buyers relating to any Excluded Liabilities, which include the OSHA Settlement if it is found to be a breach of the SPA. Therefore, the sellers' motion for summary judgment with respect to the issue of J & S's liability is **DENIED**.

### F. *Limitation on Damages*

The sellers also assert that if they are found to have breached the SPA by entering into the OSHA Settlement Agreement, section 5.1(r)(ii) limits their liability to only settlement expenses that exceed $50,000. Without elucidating how section 5.1(r)(ii) produces that result, the sellers go on to argue that they should not be held responsible for "any alleged OSHA corrective or remediation damages" or damages "for employment and training expenses relating to the assistant safety director beyond what is called for in the OSHA Settlement Agreement." Plaintiffs' Cross-Mot. for Summary Judgment at 17. The buyers do not respond to this argument.

First, I note that no breach by the sellers has been established on the cross motions for summary judgment and the sellers' argumentation fails to educate me about the specific basis for this argument. In addition, as noted above, the factual allegations regarding the cost of the Settlement Agreement are in dispute. Thus, I **DENY** the plaintiffs' motion for summary judgment on the issue of limiting damages.

### III. CONCLUSION

The plaintiffs' motion for summary judgment is **GRANTED IN PART** and I **DECLARE** that by entering into the OSHA Settlement Agreement the plaintiffs

18

did not breach sections 5.1(h), (q), (y) or (z) or sections 3.16, 3.17 or 3.18 of the SPA.  In all other respects, the plaintiffs' motion for summary judgment is **DENIED**.  The defendants' motion for summary judgment is **DENIED**.

**SO ORDERED.**

**DATED THIS 7TH DAY OF OCTOBER, 2008**

/S/ D. BROCK HORNBY
**D. BROCK HORNBY**
**UNITED STATES DISTRICT JUDGE**